and Judge Rovner, I'll be presiding today. We're going to begin by calling the first case, which is Appeal Numbers 20-1672 and 20-1724, International Union of Operating Engineers v. Daley, and we'll begin with the appellant, Mr. Lavin. Thank you, Your Honor. Good morning. You may have pleased the court. Plaintiff appellants, International Union of Operating Engineers, Local 139, Kevin Erickson and Heath Hanrahan filed this action challenging under the First Amendment certain portions of the Wisconsin Municipal Employment Relations Act as amended by the 2011 Wisconsin Act 10. For simplicity, I'm going to refer to those changes as just Act 10. And we filed this action fully recognizing the prior decisions of this court and the Wisconsin Supreme Court upholding Act 10 in the face of those prior challenges. However, all of those decisions occurred prior to the recent discussion of the First Amendment by the United States Supreme Court in Janus v. American Federation of State, County and Municipal Employees, Council 31. It's plaintiff appellant's position that Janus announced a broadening and a more aggressive enforcement of the First Amendment rights of public sector employees, both as to their right to speak and their right to remain silent. Now, the Supreme Court has repeatedly held that freedom of speech includes both the right to speak freely and the right to remain silent. Indeed, Justice Alito, as he stated in Janus, clearly stated that when speech is compelled, however, additional damage is done. You know, I understand that you believe that Janus and United Citizen expanded First Amendment rights beyond USORA, but neither case overruled USORA. And how do we then ignore that precedent? Well, we don't think that you have to. We think that looking at it now under the lens of Janus provides additional clarity that Act 10 now, we believe cannot stand on the three issues that we raised, which are discreet to our claim. You know, those issues are, you know, looking at Janus, was Janus was looking at it saying that the state cannot compel a person to subject or subsidize the speech of private speakers. Here, it's our position that Act 10 isn't compelling subsidization of speech, but rather is directly dictating the speech of the public employees. If the First Amendment does not permit the government to compel a person to pay for another person's speech, it certainly doesn't permit the government to mandate that a public employee speak on a matter or have the government then speak for them if they choose to remain silent. Mr. Lavin, your opponents characterize that as going to the subsidy, as Janus going to the subsidy, rather than a characterization of the vote. Is there a distinction between the two? I don't think there is a distinction between the two other than the fact that if subsidization of speech, and if you look at the dots that were connected in Janus, what Janus said was that those public sector employees could not be mandated by the state to then pay money into a labor union, which that money could potentially be used for speech for which that public employee disagreed. This Act 10 takes away all those middle dots and goes directly into where the state is now mandating the speech of those public employees who choose to not vote in the recertification election process. So the act of subsidization, it goes right to the actual, the state says, if you decide to stay home and not vote, then the state is going to say, we're casting our ballot against representation in lieu of your decision to stay home. I'm sorry, I didn't mean to cut you off, Justice Brewer. No, no, not at all. I didn't mean to cut you off. And in what sense is an abstention turned into a compelled no vote? Is it actually? Justice, Judge Rothner just froze on my screen. So I did not hear her full question. I don't know if it's frozen everybody else's. It did also froze here. Publication of the votes and abstentions that are recorded as no votes. Judge Rothner, I apologize, but you froze on the screen. So I did not get to hear your full question. And I told you, if you could please repeat it for me. Of course, sorry about that. What I was wondering is, how is an abstention turned into a compelled no vote? In other words, is it actually recorded as a no vote? Is it simply not counted as a yes vote? I'm wondering whether there is some formal publication of the votes and abstentions that are recorded as no votes. So what occurs in the recertification election now under Act 10 is that the, what Act 10 did is they made two changes to the voting in recertification elections. One is they changed the threshold of the percentage needed by the labor union. It used to be 50% plus one vote is what the labor union needed to achieve in order to maintain certification. We're not challenging that part. That is a setting of a threshold and that's not part of our litigation. What we're challenging is that what the state has done here is that instead of it being the people who cast votes as the determinative pool to decide whether the union achieved the threshold, the state has now stated that it is all eligible voters whether they vote or not as your pool. So what occurs is that when somebody stays home and doesn't vote, that is considered a no vote in terms of determining whether the union received 51% of the total votes cast. Of course, I've read your briefs. Of course, I understand all of that. What I'm trying to get at here is if your abstention is characterized as an abstention, what injury is there? The injury that is caused is now the person does not have a right to truly abstain. So in every election, the individual does not have a right to truly abstain in this election, to not be part of the decision-making process. All right, do they characterize your vote as an abstention? So on the sheet, what I'll say- Yes or no answer, I think. The way that the ballot tally sheet will reflect it is we'll say ballots casted for the union, ballots counted against, and then they'll say total number of eligible voters. So, and then they'll look at whether the union had 51% of the total number of eligible voters in terms of the vote cast. So I don't recall whether on the actual tally sheet, if they say number of people that abstain, but by using the total number of eligible voters, those people no longer have the option to stay at home and sit on their couch and say, I'll let everybody else decide my fate. And you have a right to do that. And that's speech in and of itself of the right to not cast a ballot. If the ability to make a decision and cast a ballot is free speech, the right to refrain from that process is. But the only way I can now avoid my sitting at home being counted against union representation is to actually go and participate in the process, which is what I don't want to do. I would like to truly abstain. If 51% of the members voted yes, would, in a recertification election, would either of the individual plaintiffs be injured? And if so, how? Well, if in this case, 100% of the voters voted for representation, but because you did not have more than 51% of the eligible voters participate in the election, the union was no longer certified as the collective bargaining representative, which is, you know, the significant here is that just a year prior, there was 51% of the bargaining that participated and all voted for union representation. So the fact that certain people decided just to say, I don't want to vote in this election, I'll go by the will, you've changed the status quo and have removed the representation that just a year prior, everyone was in favor of. If, you know, obviously if the individuals that want to just go by the whim of the voters, then they wouldn't be injured if they were able to receive a true whim of the eligible people who vote. The injury for Ms. Erickson is that she didn't want to be a decision maker. She didn't want her action to have an influence one way or the other in the outcome of this election, but she doesn't get that choice. She either has to vote or by staying home is deemed by the state that she is choosing against representation. So she no longer has the right that in every election, we have to either go and cast a ballot among the available choices or the right to say, I don't want to be part of the decision. I'll go with whatever anybody else, whatever else wants to do, I'm going to go along, I don't want to be part of the process of making that decision. The state of Wisconsin has taken that away from people because now by saying, I don't want to be part of the process, you are because of the fact that those people that don't want to vote as happened in the local 139 election, those were determined to be not sufficient for recertification. So union representation that they've enjoyed for the years up to that was taken away from everybody because people said, I'll let the rest of the group decide, but not more than 51% of the group was inclined to vote. And that's what happened here. And that's what I think is a fundamental distinction. So- Mr. Levin, on pages 11 and 12 of your principal brief, on the question of standard review, first you cite Janice, which applied an exacting scrutiny. Then you say strict scrutiny should be considered. You note in the WEAC case, we applied rational basis. And you say at a minimum, we should follow Justice Breyer's suggestion and his dissent in USERSA to apply intermediate scrutiny. Is there one standard review that you're relying on or that you're submitting to this court that we should apply? I guess the short answer is no. We're looking at it, understanding that it is kind of a moving target here, depending on what the state's advance of their interest. So what we're looking at is, under whatever review, we don't think Act 10 is gonna survive. Obviously, we think that the higher standard would be appropriate in light of Janice now giving this right to refrain from participation and emphasizing how that is even, in some cases, more of infringement of a First Amendment right than somebody who is now being stifled in whether they can say what they wanna say. But for the purposes of our submitting our briefs to you, we did outline how there has been this kind of scattershot approach of applying standards in the different cases. And we wanna recognize that to this court. But our view is, I think, regardless of what standard you apply, we don't believe Act 10 would pass the constitutional muster. The... The state asserts that you've abandoned the 14th Amendment claims. Is that correct? Yeah, we're looking at this as a First Amendment case before this court, Your Honor. Correct. So, you know, looking at why we think this is significant and, you know, the Ninth Circuit case that the state and the interveners that I rely on were involved in the referendum in Hawaii, you know, that referendum case, that was based on ballots cast. And I think that's still an important decision  What they said was that in order to prevail on a referendum to hold a constitutional convention, that a majority of ballots cast must be in favor of that referendum. What happened here is Wisconsin took it a step further and Wisconsin now is counting ballots that are not cast as part of the equation. So in Wisconsin, in Hawaii, people actually went to the polls and exercised their right to participate in the process and be part of the decision-making. They just did one of two things on the questionable ballots. They either voted both for yes and no, or they left it blank, but they were still casting a ballot. Here, but what Hawaii did not count was the people who sat at home. And they didn't say the people who sat at home gets added to the mixture of determining whether the referendum passes. Wisconsin is now saying the people who are sitting at home count in this election. And looking at this from just an election analysis, this has wide implications now if you're now allowing a state to dictate what the intent of the person who chooses not to sit at home is. And in Illinois, you have a state legislature that is a democratic and you have a governor who's democratic. So in Illinois, you could certainly have the exact same law passed as Act 10, but flipping that analysis and saying that the people who stayed at home would be considered a vote in favor of retaining the union. And certainly, the National Right to Work and the other people that sought to intervene in this case, or who are arguing for Janus, if they said, wait a second, if the state can't mandate a public employee in Illinois or elsewhere to subsidize a labor union, certainly the state can't mandate that the person who doesn't vote is actually acquiescing to voting for the union. Well, if that is wrong on that side, it's equally wrong on the side Wisconsin did, where they're saying that the people who stayed at home, us as the state get to substitute our political agenda of what we think of union representation for the non-voters. And that's what we think doesn't survive the First Amendment analysis. If they wanna make the threshold 51%, we're not arguing over that, but it has to be of the people who cast the ballot, those who chose to participate in the process. And that's where they differ, where they're now saying the people who choose not to vote, we've just taken away that option. In Wisconsin, a public sector employee no longer has an ability to just say, I don't want what I do to affect everybody else. I just wanna get along. And there are people who do that. In the last presidential election, we just had a week, 10 days ago, which was one of the highest turnouts that we've had, I think in the past 100 years, there were still 70 million people who decided that they didn't wanna vote. And that's their right, they didn't wanna do that. But those votes didn't get counted into one camp or the other by any of the states of determining who wins. Those are people who just said, I'm gonna let the rest of the country decide who's gonna be the next president. I don't wanna participate. I have another question for you, please. Sure. How does the Act 10 preclude the plaintiffs from funding the organization of their choice? In other words, what is special about payroll deductions that gives them the character of speech more than for example, an automatic deduction from a checking account? Well, before Janice, I would probably say, I would agree with you, Judge Robner, and say, prior to Janice, I don't see why these payroll deductions are being given this heightened value of speech that your money is now viewed as subsidizing the speech of that organization. But what Janice has said was that it is, that the state by compelling individuals to participate in the voluntary checkoffs, that's compelling speech of people who do not want to provide funding for organizations who may at some point potentially articulate a position that they're against. So now in light of Janice, we're bringing this case on behalf of the employees where we think the courts looked at it before and the other courts have looked at it more on behalf of the association and saying, as a public employee, if I now have, my checkoff is my speech and I'm allowed to, now the state is saying to me, because you want to speak in this manner to the labor union, we're saying no. But in Wisconsin, as we've pled in our pleadings, those public employees are allowed to give their, through payroll deductions, to causes that the state doesn't find offensive. So where does USERRA come into all this? I'm not sure I understand. That would come in on the dues case, that would be on the dues withholding analysis of payroll withholding. But we're saying now in light of Janice that that should be looked at through the lens of Janice of this now payroll deduction is a form of speech. And by the state telling a public employee, we will allow the payroll deduction for speech that we agree with as a state, but we're not gonna allow the public, you to have that same opportunity to speak for people that we don't agree with. Now there's, I think, a discrimination that wasn't apparent or as clearly defined when USERRA was decided, but now post Janice, I think needs another review. So that's why we're raising that claim here that both Ms. Erickson and Mr. Hanrahan, should choose to, they choose to voluntarily support their union. They should be allowed to do that, just like their coworkers are allowed to voluntarily support other political causes that the state is not deemed offensive. And even in Janice, they did highlight that as an option. I'm sorry. So if we would find against you, would you go to the Supreme Court and say you've got to overrule USERRA now? I think that is one of the arguments we would make if we were at the Supreme Court on that particular issue is that we would say, in light of your ruling in Janice, we think you need to now look back at this case and how you rule, and particularly where we're offering evidence of discriminatory treatment in the speech based on who the person, what voice they want to honor. And that's something I think the court needs to look at. Thank you. You're into your rebuttal time, Mr. Lavin. Would you like to preserve the remainder? Yes, I would. Thank you. If there's no other questions, I'll preserve my remainder time. Thank you. We'll now move on behalf of the Wisconsin legislature, Mr. Saitlin. Thank you so much, Your Honor. This morning, I'd like to briefly discuss why Plankton do not have standing and have failed to state a claim on their three counts. And then briefly discuss at the end, if this court was to rule against us on any of those bases, what this court should do with the intervention motion that the district court denied as moot. I have a question for you before you begin, because I am truly perplexed about why you appealed. You were not a party below. And the only ruling affecting you was the denial of the motion to intervene on the ground of mootness. A ruling that you seem to expressly agree was within the district court's discretion. So what is left for appeal? I mean, why wait to see if we remand and if then renew your motion in the district court now that your participation may no longer be moot? I really am in a quandary. Well, Your Honor, we certainly had the statutory right to appeal. We thought that we should have been granted intervention at the outset in the district court, because we have under state law, the authority to defend state law in the same way and to the same extent that the attorney general has. Just like if this case did not involve the attorney general and the attorney general came in and said, I wanna defend state law, and that intervention was denied as moot. I'm quite confident that if that decision, dismissing a challenge to state law were then appealed, the attorney general would still have felt it incumbent upon him to, in the court of appeals, in this court, continue to defend state law. As the- Characterizes itself as an appellee. That's at page one of your response, your principle and response brief. In its brief, responding to your separate appeal of the mootness finding, the government says the legislature is not an appellee, because it was not a party, that it is only a proposed intervener in the appeal. If you are simply a proposed intervener, is it advisable for this court to allow intervention on behalf of a party that is already very ably represented? Is it fair to the plaintiffs that the state gets an extra 50 pages of briefing through your participation here? Well, your honor, the plaintiffs didn't oppose our intervention below and did not oppose any of our arguments here. The only party that opposed us was the attorney general in his continuing effort to nullify the state Wisconsin law that gives us a co-equal seat at the table in defending state law. As your honor knows, we just had this fight with the attorney general in the Boston case, where again, in the state Supreme court, he tried to give us second class status in defending state law. That is with respect, not the state of law of Wisconsin. We have an equal right to the attorney general to defend state law. And that is exactly what we're doing here. And by the way, that's exactly what we did in the district court. And if your honor were to look at the pleadings in the district court, we were the only party speaking on behalf of the state that even raised the standing argument. The attorney general in his motion to dismiss did not mention the standing argument. And yet that was the basis for the majority of the dismissal of the complaint. Now, if I may, I would like to talk about the laws here because we as a representative of the state do think it's very important that act 10 be upheld. Now, the first provision that the plaintiff's challenge or the one that my friend on the other side spent the majority of his time on today is the absolute majority requirement. Now, there is no standing and there is no compelled speech for interrelated reason, which is to say that when a state enacts an absolute majority requirement, all it is is setting permissibly the rules of the game. It is in principle no different than a super majority requirement. That is to say it just makes it harder for those who want a particular result to get there. In a super majority requirement, they have to get 60%, 70% of those casts. In an absolute majority requirement situation, they have to get 50% plus one of those who actually vote. And the claim that an absolute majority requirement and a super majority requirement are constitutionally identical isn't just me saying it, that's the Supreme Court's words in the Gordon versus Lane case that we cited in our, and they said it was, quote, no constitutional difference. So since there is no serious argument that in a super majority requirement that somehow those who choose not to vote are being compelled or choose speech for the same reason, in a absolute majority regime, there is no compelled speech. Now, moving on to their second count, this has to do with the limitations on the permissible subjects of collective bargaining and limiting that to total-based wages. This court's decision in Laborers Local settles this issue. What Laborers Local says is that this provision of Act 10 doesn't stop the union from saying anything, doesn't stop the union from doing anything it wants to do. And in fact, we see in their complaint at short appendix 30 from 31, they're engaging in wide-ranging conversations with municipalities. What Act 10, especially this provision does, is it prohibits the municipality from taking certain actions, from actually coming to an agreement. That isn't a restriction on speech of the private party, that is a restriction on the actions of the government. And as Laborer Local clearly says, that is not unconstitutional. And finally, the prohibition on payroll deductions. Now, Judge Robner, you mentioned that this is plainly foreclosed by USERRA, but I think there is a threshold issue here why this court cannot actually reach that issue. As you heard my friend say in his presentation, and as they say in their complaint, short appendix 31 through 33, they are bringing this claim not on behalf of the plaintiff union, they're bringing it on behalf of only the employees. And if your honors were to look at short appendix 31 through 33, there is not a word in that complaint that says that any employee ever used a payroll deduction before Act 10, that any employee wants to use a payroll deduction if they win this lawsuit, or that even if they wanted to use it, that this would be any more or less burdensome than as Judge Robner pointed out, just having an automatic deduction from their checking account of the same amount of money flowing by the union. That's also one computer click away. So that is my presentation on the merits. If your honors don't have any further questions on that, I'm glad to yield back the rest of my time to the court. Hearing no further questions, thank you, Mr. Staitman. We'll now move on behalf of the state of Wisconsin to Mr. Koski, Mr. Koski. May it please the court. Good morning, your honors. Clay Koski appearing on behalf of James Daly. And I have three points. First, the district court correctly dismissed the plaintiff's challenge to the absolute majority requirement for certification elections. That requirement does not compel the plaintiffs to speak, nor does it require them to subsidize speech in violation of Janus. Second, the district court correctly dismissed the plaintiff's challenge to the limitation on the subjects of collective bargaining, as that challenge is foreclosed by Laborers Local 236, a case that Janus did not disturb. And third, the district court correctly rejected the plaintiff's challenge to the dues deduction provision in Act 10. That challenge is foreclosed by USRSA, the US Supreme Court decision, and by WEAC, this court's decision. And those are decisions, again, that Janus did not disturb. Janus does not make Act 10 unconstitutional. Janus did not disturb any of this court's precedents that upheld the challenge provisions of Act 10. Therefore, this court should affirm the district court's judgment. With regard to the first count, Act 10, in fact, preserves the plaintiff's free speech. It allows them the choice of voting for a union, voting against it, or not voting. They hold the keys. There is nothing like, this is nothing like the law that was at issue in Janus, which required non-consenting, non-members of unions to pay agency fees to the union for speech that those employees did not necessarily support. Completely different sorts of laws. And so we believe that this provision of Act 10 is unaffected by Janus, and we believe that count one fails for that reason. Mr. Klosky, could you respond to the first question that I asked Mr. Clayton about, you know, how the abstentions are recorded? Are they, are they simply recorded as an abstention? I believe what's counted, first I'll point out Judge Rovner, this is not material that's in the complaint. So the court's limited to the complaint, but as far as I understand it, we're counting the number of yes votes compared against the total number of potential voters. Because they're not recorded as no votes. That's my understanding, and that's certainly not what the plaintiffs have pled in their complaint. I mean, they're not saying that there's some document that shows that certain voters voted no. So to say that votes are converted to a no, not only is that not pled in the complaint, but as far as I understand it, that is not what occurs. So, okay, just so I'm 100% clear, the statute requires that in order to recertify at least 51% of all members vote yes. And the statute does not assign any meaning to whether the remaining members vote no or simply abstain, is that right? That's right. The statute says nothing about that. The statute merely establishes that threshold. It's just an election procedure. It says, here's what you need to get to have a winner. And it's very different from other sorts of elections. We're not picking a candidate. There aren't two candidates. It's just a, yes, this union is certified. It has to reach 51% of all eligible voters. So it's very different than, it would be wrong for the court to go down a track trying to compare it to like a presidential election or some candidate election. That doesn't fit as an analogy. We also believe, as Mr. Saitlin pointed out, that the U.S. Supreme Court has said that this sort of arrangement does not offend the constitution. In the Gordon case, 403 U.S. at six, quote stated, quote, there is nothing in the language of the constitution, our history or our cases that requires a majority always prevail on every issue. In County of Cass versus Johnston, 95 U.S. at 369, the court said all qualified voters who absent themselves from an election duly called are presumed to send to the express will the majority of those voting, unless the law providing for the election otherwise declares. And that is what Act 10 does here. So we believe that under controlling U.S. Supreme Court precedent, a regulation like the certification requirement is permissible. With regard to the second count, which is the limitation on the subjects of collective bargaining, this court held in Labor is Local that general employees under Act 10, quote, remain free to associate and represented employees in their unions remain free to speak. Municipal employers are simply not allowed to listen at 749 F third at 635. So we believe that this court has already resolved the second claim. It's interesting the court could look at that second count either as the district court did as a standing issue in that, because it's a limitation on the employer's ability to listen, it is not injuring the employee. They are free to speak. There's no violation of their free speech rights. You just jogged something. Why shouldn't we consider the additional allegations that the plaintiff raised in response to the district court's order for additional briefing on standing in count one? If we accepted those allegations, would it change the result? So to answer your first question, the Daly's position is that this court should not address those additional allegations. That would violate black letter law in this circuit. This court has said repeatedly, as we stated in our brief, we're looking at the four corners of the complaint. In that complaint, neither plaintiff says that they were a non-voter. They claim that only non-voters would be those that are injured, but they don't even specify in the complaint in any allegation that either of them is a non-voter. So number one, looking at the four corners of the complaint, you cannot get there. There's no standing. And we think that even if this court were to wrongly consider the allegations, the non-pled allegations from the briefing, which again, black letter law of this circuit says you cannot modify the complaint through briefing. If this court violated that rule, we still think that the plaintiffs lose, because again, this law does not compel any speech, as I said at the beginning of my remarks. So as I was pointing out with regard to count two, which was a collective bargaining limitation, the plaintiff's argument runs headlong into the laborers local case, which was relying upon US Supreme Court precedent in the Smith and Knight cases. In Smith 441 US at 465, the court said, quote, the first amendment does not impose any affirmative obligation on the government to listen, to respond, or in this context, to recognize the association and bargain with it. On Knight 465 US at 285 is very similar. Those are the two primary decisions that this court relied upon in laborers local 236. Janice doesn't touch those decisions. Janice says nothing about those decisions. So to say that Janice somehow alters the playing field with regard to the first amendment is incorrect. With regard to count three, which is the dues deduction provision in act 10, we believe that the USERSA case controls. US Supreme Court case from 2009, 555 US at 359, quote, the state is not constitutionally obligated to provide payroll deductions at all, end quote. If the state isn't required to provide payroll deductions at all, how can what it did here be in violation of that principle? The court has already been through that in the WEAC case. Court has addressed issues in that case that the plaintiffs, I'll point out, did not raise here regarding viewpoint discrimination, but the court has already resolved those issues. So we believe that USERSA in this court's decision and WEAC control for that third count, which also was properly dismissed. Those are the main points I wanted to make. I also want to just make one point regarding Janus. If you want to really drill down on why Janus doesn't apply, look at that last section of the Janus decision. This is 138 S court at 2486, quote, states and public sector unions may no longer extract agency fees from non-consenting employees. Court goes on to say, this procedure violates the first amendment and cannot continue. That is the procedure that the court was dealing with in Janus, agency fees. It had nothing to do with voting. Although the case did address compelled speech, as I've said, Act 10 doesn't compel any speech. The employees are free to vote in favor of the union, to vote no against the union, or to not vote. And so there is no violation under Janus. I see I have a number of minutes left. I'd be happy to answer any of the court's questions. Thank you, Mr. Koski. Thank you, Your Honor. Mr. Laban, we're gonna move back to you for rebuttal. Thank you. Just briefly, a couple of points. As we argued in our brief, we believe it is appropriate in this particular instance for the court to look at the supplemental amended complaint that was filed or requested to be filed with the court below because of the unique procedural posture of this case. Now you've phrased that as a supplemental amended complaint. There was only one complaint filed, and then you wanted to supplement and attach that to your briefing, correct? Correct. That was in response to an invitation from the district court requesting supplemental briefing on the issue of standing. And in fact, the district court, as an example of somebody that the district court believed would potentially have standing, cited a case which Ms. Erickson satisfied. And that is somebody who did not want to vote in the election, but rather wanted the will of the group to determine her fate and not have to be part of the decision-making process. So we went back and looked and found through the non-voters, do we have people that would fit that? And we also found Mr. Hanrahan, whether we think also has an injury that we could assert. So it was in response to the invitation of the court that we did what the district court asked us to do, but then the district court then dismissed us on the initial, after following that pleading. So we do think it's appropriate for the court to look at it just because of the unique posture of how that got there before the lower court below. With respect to the Supreme Court cases, Cass and Gordon that are being cited by my colleagues here, first point is that those weren't looked at in a first amendment analysis or a first amendment lens, but also this language that they're reading that this stating that it's the majority of votes cast unless the law providing for the election otherwise declares, the way they're now reading that is just beyond the pale of what that court meant. What the court meant was setting the threshold of 50% or super majority has been discussed, whether that be 60%, 75%. Of ballots cast, those cases were ballot cast cases. So to now read this, unless the law provided for the election otherwise declares to just be open season on anything that the state decides to be. So for example, if the state of Wisconsin said, we want it to be of all eligible employees, whether they would be in the bargaining unit or not, that would be the state now declaring that the universe that the union needs to get 51% of would be the 30 people in the bargaining unit, plus the other 50 people that aren't part of the bargaining unit. And they say all public sector employees employed by the County of Marinette is now the pool that we have to get 51% of, even though only a fraction would be part of it. That is just beyond what the court was saying when they said, unless the law provided for otherwise. What they were saying was, when you have ballots that are cast, the state can dictate the number that's needed for a winner. And we're not disputing the state here, what they did when they went from 50% plus one to 51%, despite the fact that, that moved the goalposts by hundreds of votes, that one action, because some of these bargaining units are well over a thousand to 10,000 or more people in a bargaining unit. So by just changing it from 50% plus one to 51%, the union needs to get several hundred more votes to prevail. That's not the issue because it's still counting the ballots cast and still allowing people to stay at home and choose to let others decide their fate. That ends my presentation and my time. So I just wanna thank the court unless there's any other questions. Thank you, Mr. Lavin. Thank you, Mr. Saitlin. Thank you, Mr. Koski. The case will be taken under advisement.